IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Evelyn Armstrong | : | |
| | : | Case No. C-1-02-701 |
| Plaintiff | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART |
| U.S. Bank *et al.* | : | AND DENYING IN PART |
| | : | DEFENDANTS' MOTION TO |
| Defendants | : | DISMISS |

This matter comes before the Court on Defendants' City of Cincinnati & Police Officers Fangman and Chatman['s] Motion to Dismiss Second Amended Complaint (doc. # 20). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (doc. # 20).

I.      **BACKGROUND**

As is required on a motion to dismiss, the Court takes as true all allegations contained in Plaintiff's complaint. Plaintiff Evelyn Armstrong is a mentally challenged 39-year-old African-American woman. Defendants in this case are the City of Cincinnati ("City") and Cincinnati Police Department ("CPD") Officers Helen Fangman and Dean Chatman ("Defendant Officers"), in both their official and individual capacities.

On June 18, 2002, Armstrong went to the USBank/Firstar Bank ("bank") located at Fifth Street and Walnut Streets in Cincinnati, Ohio. After cashing her paycheck, Armstrong left the bank and headed for the bus stop. Meanwhile, a bank employee reported that an African-

American female was in the bank trying to pass a stolen check.  Glenda Moore, the bank's Pinkerton Security Agent, received a radio transmission to that effect.  Moore also claims that she received a radio transmission indicating that a heavy-set African-American woman was leaving the bank.  Moore exited the building to try to apprehend the culprit.  In the meantime, a bank employee called the CPD.

Once on the street, Moore spotted Armstrong and followed her down the street.  Moore then saw a police cruiser driving down Fifth Street and flagged it down.  Officers Fangman and Chatman were in the cruiser.  Moore told Officer Fangman that Armstrong had tried to pass a stolen check.  Officer Fangman got out of the police cruiser, approached Armstrong, and without making any inquiries, took Armstrong's arm and put a handcuff on her wrist.  Armstrong became frightened and began to cry and back away from Officer Fangman, attempting to tell her that Armstrong had done nothing wrong.  Armstrong alleges that Officers Fangman and Chatman "ruffed-up [sic]" Armstrong, and "maced [her] in the face, mouth, and nose; threw her body up against the police cruiser, and then placed her in back of the police cruiser."  (Doc. # 19, ¶¶ 42.) Plaintiff alleges that "[i]t takes, at the very most, approximately 30 seconds of talking to [Armstrong] to realize that she is mentally challenged."

Next, a bank employee approached Defendant Officers, looked at Armstrong, and told Defendant Officers that Armstrong was not the woman who tried to pass a stolen check. Defendant Fangman cursed at Moore, to which Moore allegedly responded, "you still have her for resisting."  (Id. at ¶ 46.)

Officers Fangman and Chatman charged Armstrong with obstructing official business and took her to jail.  Officer Fangman signed a complaint against Armstrong for obstructing

official business by "refuse [sic] her identity and refus[ing] to answer questions which hampered said public official and the performance of his/her lawful duties."

A few days after Armstrong's arrest, unidentified Cincinnati Police Officers went to Armstrong's mother's home to find her.  Armstrong alleges that this intimidated her family and caused them to fear for her safety.  (Id. at ¶ 49.)

On September 20, 2002, Armstrong's trial on the charge of obstructing official business began in the Hamilton County Municipal Court.  After hearing the Assistant City Solicitor ("ACS")'s account of the case, the court requested that the ACS discuss dismissing the case with Moore and Officers Fangman and Chatman.  Defendant Officers refused to dismiss the charge and so the court proceeded with the trial.  After Moore testified on direct, the court requested to see the ACS and Armstrong's counsel.  The Court requested that the City dismiss the case because the facts did not demonstrate that Armstrong committed a crime.  The City and officers again refused to dismiss the charge against Armstrong.  The trial continued and when the City rested its case, Armstrong's counsel made a Rule 29 motion requesting the judgment of acquittal, which the Court granted.

Armstrong filed her initial complaint on September 30, 2002.  On June 3, 2004, Armstrong filed her Second Amended Complaint For Civil Rights Violation; Conspiracy to Violate Civil Rights; False Arrest; Malicious Prosecution; Assault and Battery; and Intentional Infliction of Emotional Distress (doc. # 19).

## II.     JURISDICTION AND LEGAL STANDARD

This Court has jurisdiction over Armstrong's federal claims under 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Armstrong's state law claims pursuant to 28 U.S.C. § 1367.

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In assessing the sufficiency of a complaint, courts must follow "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  This accords with the purpose of Rule 12(b)(6), which the Sixth Circuit has explained "is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true."  Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993).

The Armstrong's complaint, on the other hand, makes no allegations that Defendant Officers tried to question her, let alone that she refused to answer them.  Therefore, "[o]n a Fed.R.Civ.P. 12(b)(6) motion, all of the allegations contained in the plaintiff's complaint are accepted as true, and the complaint is construed liberally in favor of the party opposing the motion."  Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995).  At the same time, however, the Court "need not accept as true legal conclusions or unwarranted factual inferences."  Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987).

III.    ANALYSIS

A.    Federal Claims

Armstrong brings federal claims under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(2) arising from her arrest and prosecution, respectively.

1.       **Civil Rights Violation Under 42 U.S.C. § 1983**

      a.      **Defendant Officers' Qualified Immunity**

Armstrong alleges that Officers Fangman and Chatman subjected her to unreasonable search and seizure and excessive use of force, thereby depriving her of rights, privileges and immunities secured by the Fourth and Fourteenth Amendments. (<u>See</u> doc. # 19, ¶¶ 72-73.) Defendants argue that Armstrong cannot maintain her federal claims against Defendant Officers because they have qualified immunity under federal law. Under the doctrine of qualified immunity, "'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Feathers v. Aey</u>, 319 F.3d 843, 847 (6th Cir. 2003) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).

There is a three-part test for whether a government official is protected by qualified immunity: "First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of clearly established constitutional rights.'" <u>Id</u>. at 848.

      1)      **Unreasonable Search and Seizure**

Armstrong alleges that Defendant Officers subjected her to an unreasonable search and seizure in violation of her rights under the Fourth Amendment. (<u>See</u> doc. # 19, ¶ 73.) First the Court must consider whether a constitutional violation occurred. If Defendant Officers arrested

Armstrong without probable cause, then the arrest violated her Fourth Amendment rights. See Sandul v. Larion, 119 F.3d 1250, 1256 (6th Cir. 1997). Defendant Officers had probable cause to arrest Armstrong if there were sufficient facts and circumstances within their knowledge for a reasonable officer to believe that Armstrong had committed a crime. See Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

Defendant Officers arrested Armstrong because a bank security officer, who was in uniform, told them that she had tried to pass a stolen check. Although this turned out to be false, the Court finds that reasonable officers, with the facts Defendant Officers knew at the time they first stopped Armstrong, would have believed they had probable cause to arrest Armstrong for trying to pass a stolen check. Thus, according to Armstrong's own account, Defendant Officers had probable cause to make the initial arrest, and no constitutional violation resulted from that arrest.

The question remains, however, whether Defendant Officers had probable cause to maintain their arrest[1] of Armstrong for obstructing official business after they learned she had not, in fact, tried to pass a stolen check. In Ohio, obstructing official business is described as follows: "No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties." See Ohio Rev. Code § 2921.31. In her complaint, Armstrong

---

[1]Defendant Officers had already arrested Armstrong, handcuffed her, and put her in their cruiser, before they were told by a bank employee that Armstrong was not the person that tried to pass a stolen check. (Doc. # 19, ¶¶ 42-44.)

admitted that she resisted being handcuffed,[2] which Ohio courts have found to be evidence of obstructing official business under section 2921.31.[3]  See, e.g., State v. Mills, Nos. 02CA0037-M, 02CA0038-M, 2002 WL 31890133, at *4, *5, *7 (Ohio App. Ct. Dec. 31, 2002) (affirming conviction for obstructing official business and resisting arrest where, when officer attempted to handcuff defendant, defendant pulled away).   The Court thus finds that, by Armstrong's own account, the facts within Defendant Officers' knowledge at the time, and the state of the law when Armstrong was arrested, a reasonable officer would have believed that Armstrong could be arrested for obstructing official business.[4]

As such, Defendant Officers had probable cause to maintain Armstrong's arrest.  See DeFillippo, 443 U.S. at 37 (defining probable cause).  Because Defendant Officers had probable cause to maintain her arrest, they did not deprive Armstrong of a constitutional right, and they are therefore entitled to qualified immunity on this claim under 42 U.S.C. § 1983.  See Sandul,

---

[2]Armstrong's complaint explains that when Officer Fangman put a handcuff on one of Armstrong's wrists, Armstrong backed away from her.  (See doc. #1, ¶ 37-38.)

[3] The complaint for obstructing official business which Officer Fangman signed against Armstrong alleges that she refused to cooperate with Defendant Officers, refused to give her identity, and refused to answer questions, which hampered their ability to perform their duties.  (See Doc. #1, ex. 1.)  Armstrong's complaint, however, makes no allegations that Defendant Officers tried to question her.  Ohio courts have found that, depending on the circumstances, a person may be convicted of obstructing official business by refusing to identify oneself or refusing to answer the police's questions.  See, e.g., Dayton v. Turic, No. 20149, 2005 WL 78498, at *6 (Ohio App. Ct. Jan. 14, 2005); In re Sommer, No. 2004CA00074, 2004 WL 2496452, at *1-*2 (Ohio App. Ct. Nov. 1, 2004).  The Court need not consider this issue, however, as Armstrong's complaint itself states facts which are sufficient for a reasonable officer to believe that Armstrong could be arrested for obstructing official business.

[4]The Court notes that the fact that Armstrong was later acquitted of the crime for which she was arrested does not affect the validity of the arrest.  See DeFillippo, 443 U.S. at 36.

119 F.3d at1254.  Defendants' motion to dismiss is therefore **GRANTED** as to Armstrong's unreasonable search and seizure claim under § 1983.

**2)      Excessive Force**

Armstrong also claims that Defendant Officers subjected her to excessive force in violation of her Fourth Amendment rights.[5]  Again, in determining whether Defendant Officers are entitled to qualified immunity, the Court must first determine whether the facts viewed in the light most favorable to Armstrong show that a constitutional violation has occurred.  See Feathers, 319 F.3d at 848.  The question of whether an officer used excessive force is analyzed under an objective reasonableness standard, requiring this Court to consider whether the force used to subdue Armstrong was reasonable from the perspective of a reasonable officer on the scene.  See Greene v. Barber, 310 F.3d 889, 898-99 (6th Cir. 2002).  Although the use of eye irritant is also often held not to be an excessive use of force, those cases are usually limited to situations where the suspect is armed or where the officers fear for the suspect's own safety.  See Kaylor v. Rankin, 356 F. Supp. 2d 839, 851-52 (N.D. Ohio 2005).  The Sixth Circuit has thus held that an officer's use of an eye irritant may, depending on the circumstances, constitute excessive force, even where, as here, officers are attempting to arrest a suspect who is resisting

---

[5]Armstrong also appears to claim that Defendant Officers subjected her to excessive force in violation of her Fourteenth Amendment rights.  (See doc. # 19, ¶ 72.)  A claim for excessive use of force arising out of an arrest, however, is properly stated and analyzed under the Fourth Amendment, not the Fourteenth Amendment.  See Conley v. City of Lorain, No. 98-4351, 1999 WL 1021650, at **1 (6th Cir. No. 2, 1999) (citing Graham v. Connor, 490 U.S. 386, 394-95 (1989)).  The Court thus **DISMISSES** Armstrong's claim for excessive use of force under the Fourteenth Amendment.

8

arrest.[6]  See Greene, 310 F.3d at 898-99; see also Kaylor, 356 F. Supp. 2d at 851-52.  Armstrong has alleged no facts suggesting that she was armed, or that there was cause for the officers to fear for her safety, though she has alleged facts suggesting she was resisting arrest.  Armstrong has also alleged that Defendant Officers were physically rough with her and threw her up against their cruiser.  The Court thus finds that Armstrong has alleged facts that, if true, show that Defendant Officers subjected her to excessive force causing a constitutional violation.

The Court must consider next whether the violation involved a clearly established constitutional right of which a reasonable person would have known.  See Feathers, 319 F.3d at 848.  The question of whether a right was clearly established is analyzed according to the specific situation in the case at hand, rather than as a general proposition.  See Greene, 310 F.3d at 894.  The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his actions were unlawful in the situation he confronted.  See id.  The question is whether the law has put an officer on notice that his conduct would be unlawful.  It need not be that the particular conduct in question has been held unlawful, so long as the unlawfulness is apparent in light of pre-existing law.  See Feathers, 319 F. 3d at 848.  In determining whether a right was clearly established, the Court may consider whether officers should be on notice from either the specific facts of particular prior cases or the general reasoning of such cases.  See St. John v. Hickey, No. 04-3388, 2005 WL 1431400, at *9 (6th Cir. June 20, 2005) (citing Feathers, 319 F. 3d at 848.).

---

[6]Armstrong argues in her Memorandum in Opposition (doc. # 23) that Defendant Officers' use of force was excessive because Defendant Officers maced Armstrong after she was already handcuffed.  The Court notes that this contention is contrary to the factual account in Armstrong's complaint, which suggests that Defendant Officers had only one of Armstrong's wrists secured before she resisted and mace was used.  (See doc. # 19, ¶¶ 37-42.)

Both <u>Greene</u> and <u>Hickey</u> are instructive here. In <u>Greene</u>, the Sixth Circuit held that a reasonable officer would not necessarily know that it was unlawful to use an eye irritant when a suspect was actively resisting arrest and the officer was following police procedure for restraining non-cooperative arrestees. <u>See</u> <u>Greene</u>, 310 F.3d at 899. In <u>Hickey</u>, by contrast, the Sixth Circuit held that a reasonable officer would have known that inflicting unnecessary pain on a nonviolent arrestee violated a clearly established constitutional right. <u>See</u> <u>Hickey</u>, 2005 WL 1431400 at *9.

In this case, under the facts alleged, while Armstrong did resist being handcuffed, Defendant Officers already had one of her wrists handcuffed before they used mace. Moreover, though Armstrong resisted arrest, she did not do so violently, but rather by backing away while crying. Considering the alleged facts in light of the general reasoning of cases involving similar facts, the Court holds that a reasonable officer would have known that, because Armstrong was not violent, inflicting unnecessary pain on her by spraying her with mace, throwing her up against the car, and roughing her up violated her clearly established constitutional rights. Likewise, given that Armstrong has alleged that Defendant Officers maced and threw against a car a mentally disabled woman whose resistance was limited to tearfully backing away, the Court finds Defendant Officers' actions were objectively unreasonable. <u>See</u> <u>Minchella v.</u> <u>Bauman</u>, No. 02-1454, 2003 WL 21957034, at **5 (6<u>th</u> Cir. Aug. 13, 2003). Defendants' motion to dismiss is thus **DENIED** as to Armstrong's excessive force claim against Defendant Officers under 42 U.S.C. § 1983.

**b.      Claim Against the City**

Armstrong alleges that the City is liable for Officers Fangman and Chatman's conduct under 42 U.S.C. § 1983.  The Court has found that Armstrong states a claim against Defendant Officers under section 1983 for excessive use of force.  Even so, the City is "not automatically liable under § 1983, as there is no *respondeat superior* theory of municipal liability under § 1983."  See City of Canton v. Harris, 489 U.S. 378, 387 (1989).  "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978); see also Garner v. Memphis Police Dept., 8 F.3d 358, 364 (6th Cir. 1993) (citing Monell).

Armstrong alleges first that the City has a policy that encourages and acquiesces in Fourth and Fourteenth Amendment violations, which qualifies as "a continuing pattern and practice of civil rights abuses by the [CPD]."  (See doc. #19, ¶ 12.)  To state a pattern and practice claim, Armstrong must make more than a conclusory allegation that such a pattern and practice exists.  See Chapman v. City of Detroit, 808 F.2d 459, 465 (6th Cir. 1986).  Armstrong mentions one other incident involving Lorenzo Collins, a mentally challenged person who was allegedly subjected to excessive force by the police.  But an isolated incident alleged in a complaint, especially one that involves city employees below the policy-making level, such as Defendant Officers in this case, is not sufficient to show a city policy.  See Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2nd Cir. 1991) (citing City of Canton, 489 U.S. at 387.).  Further, Armstrong makes no allegation explaining what the City's alleged policy is.  Finally,

11

Armstrong also fails to allege the required causal connection between her alleged injury and the City's alleged policy. Armstrong's conclusory allegations thus do not state a pattern and practice claim under section 1983.

Armstrong argues next that the city is liable because it showed a deliberate indifference by failing to adequately train and discipline its police officers. (See doc. #19, ¶ 12.) A city's failure to train may also represent a policy for which the city is responsible if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." See City of Canton, 489 U.S. at 390. Beyond the conclusory allegation itself, Armstrong makes no factual allegations explaining in what way the City failed to train its officers, and thus fails to state a claim for deliberate indifference by failure to train.

A city may also be found deliberately indifferent "where the city fails to act in response to repeated complaints of constitutional violations by its officers." See Brown v. Shaner, 172 F.3d 927, 931 (6th Cir. 1999), cert. denied, 528 U.S. 966 (1999). Again, although Armstrong mentions the alleged incident involving Lorenzo Collins, Armstrong fails to allege that there have been repeated complaints of constitutional violations, let alone repeated complaints that the City has ignored. Armstrong has also failed to allege any casual connection between a City policy or failure to train and her alleged injury. Armstrong thus fails to state a claim for deliberate indifference under section 1983.

For the foregoing reasons, Armstrong has failed to state a claim under 42 U.S.C. § 1983 against the City and Defendants' motion to dismiss is **GRANTED** as to that claim against the City.

### 2.    Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1985(2)

Armstrong alleges that Defendant Officers conspired to violate her civil rights by filing a frivolous charge of obstruction of justice against her to cover up their own wrongful conduct, and by interfering with the judicial proceeding on that charge.  (See id. at ¶¶ 75-77.)

Conspiracy to violate civil rights is defined, in part, as when two or more people conspire:

> to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws.

See 42 U.S.C. § 1985(2).  To state a claim under section 1985(2), a plaintiff must allege either 1) the existence of a conspiracy to interfere with the administration of justice in federal court; or 2) the existence of a conspiracy to obstruct justice in state court motivated by an intent to deprive the victim of the equal protection of the laws.  See Kush v. Rutledge, 460 U.S. 719, 724-25 (1983).  Armstrong's allegations involve a state proceeding, and thus fall within the second subsection of section 1985(2).

13

To state a claim for conspiracy under 1985(2), a plaintiff must allege "'(1) a conspiracy involving two or more persons, (2) for the purpose of depriving, directly or indirectly, a person or class of persons the equal protection of the laws and (3) an act in furtherance of that conspiracy (4) that causes injury to person or property, or a deprivation of a right or privilege of a United States citizen.'" See White v. Trapp, No. 03-1612, 2004 WL 231793, at **2 (6th Cir. Feb. 4, 2004) (claim under 1985(2) and 1985(3)) (citing Colyer v. Darling, 98 F.3d 211, 233 (6th Cir. 1996) (claim under 1985(3))). A plaintiff must also allege that the conspiracy involved racial or other class-based invidious discrimination. See Parsons v. Fisher-Titus Med. Center, No. 95-4069, 1996 WL 437950, at **1 (6th Cir. Aug. 2, 1996) (citing Rutledge, 460 U.S. at 725-26); see also Ellison v. Leffler, No. 93-2606, 1994 WL 276926, at **1 (6th Cir. June 21, 1994). Although Armstrong mentions in her complaint her status as both an African-American and a mentally handicapped person, Armstrong does not claim that Defendants' alleged conspiracy was motivated by discrimination on the basis of these or any other qualities. Armstrong instead alleges that Defendant Officers' purpose in charging her with obstructing official business and maintaining that suit was "to cover up their wrongful conduct," rather than to deprive her of the equal protection of the law. (See id. at ¶¶ 66-67, 76). Armstrong has thus failed to state a claim under 42 U.S.C. § 1985(2) and Defendants' motion to dismiss is **GRANTED** as to that claim.

### B.     State Law Claims

#### 1.     False Arrest and Malicious Prosecution

An action for false arrest is closely akin to one for malicious prosecution, but involves a crucial distinction. See Evans v. Smith, 97 Ohio App. 3d 59, 69, 646 N.E.2d 217, 224 (Ohio App. Ct. 1994). A "suit for false arrest or false imprisonment is the proper action where the

aggrieved party is arrested without legal process, or under a void process; but where the process on which the arrest is made is regular on its face, but is sued out maliciously and without probable cause, the remedy is an action for malicious prosecution." Rogers v. Barbera, 170 Ohio St. 241, 244, 164 N.E.2d 162,164 (Ohio 1960) (internal quotations and citations omitted).

A claim of false arrest requires allegations that a person was intentionally confined for an appreciable period against her will and without lawful justification. See Evans, 97 Ohio App. 3d at 70, 646 N.E.2d at 224. The guidelines for determining whether a detention is lawful under Ohio law come from federal Fourth Amendment jurisprudence. See Harvey v. Horn, 33 Ohio App. 3d 24, 28, 514 N.E. 2d 452, 455 (Ohio App. Ct. 1986). The Court has already found that Defendant Officers had probable cause to arrest Armstrong based upon Armstrong's own recitation of the facts. (See supra section III.A.1.a.1)). Thus, neither a Fourth Amendment violation nor an unlawful detention occurred and Armstrong has failed to state a claim for false arrest. The Court therefore **GRANTS** Defendants' Motion to Dismiss as to Armstrong's false arrest claim.

The essential elements of a claim of malicious prosecution are: 1) malice in instituting or continuing the prosecution; 2) lack of probable cause for undertaking the prosecution; and 3) termination of the prosecution in favor of the party alleging malicious prosecution. See Trussell v. Gen. Motors Corp., 53 Ohio St. 3d 142, 144, 559 N.E. 2d 732, 735 (Ohio 1990). For purposes of a claim for malicious prosecution, the question is not whether the claimant actually committed a crime. See McFinley v. Bethesda Oak Hosp., 79 Ohio App. 3d 613, 616-17, 607 N.E.2d 936, 939 (Ohio App. Ct. 1992). Rather, the question is whether a criminal prosecution was undertaken without probable cause. Id. A criminal prosecution is undertaken without probable

15

cause if the defendant instituted or continued the prosecution without '[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused [was] guilty of the offense with which he [was] charged.'" See id., 97 Ohio App. 3d at 68, 646 N.E.2d at 223. This standard is substantially similar to that for probable cause to arrest under federal law. Cf. id. and DeFillippo, 443 U.S. at 37 (probable cause to arrest exists where there are sufficient facts and circumstances within an officer's knowledge for a reasonable officer to believe that the suspect had committed a crime).

Although the question of probable cause is often one of fact to be decided at trial, when the record supports only one conclusion, it may be decided as a matter of law. See McFinley, 79 Ohio App. 3d at 617, 607 N.E.2d at 939. Again, the Court has already found that Defendant Officers had probable cause to arrest Armstrong based upon Armstrong's own recitation of the facts. (See supra section III.A.1.a.1)). For the same reasons, the Court finds that Defendants had probable cause to institute a prosecution against Armstrong and Armstrong cannot state a claim for malicious prosecution. The Court therefore **DISMISSES** Armstrong's claim for malicious prosecution.

### 2. Assault and Battery

Armstrong brings her assault and battery claim against Defendant Officers. In Ohio, "an assault is an unlawful offer or attempt, coupled with a present ability, to inflict an injury upon the person of another." See Woods v. Miamisburg City Schools, 254 F. Supp. 868, 878 (S.D. Ohio 2003) (citations omitted). A battery "occurs when a person acts intending to cause a harmful or offensive contact, and when a harmful contact results." See id. (citations omitted). Armstrong's allegations that Defendant Officers caused her physical harm by using mace on her,

16

being physically rough with her, and throwing her up against their police cruiser are sufficient to state a claim for assault and battery. See id. at 878-79 (holding plaintiff stated claim for assault and battery where she alleged officer grabbed her and threw her up against wall).

Defendant Officers are nevertheless immune from liability under Ohio Rev. Code § 2744.03(A)(6) unless Armstrong alleged either that Defendant Officers' actions were outside the bounds of their employment, that Defendant Officers acted with malice, in bad faith, or wantonly and recklessly, or liability is imposed upon Defendant Officers by a section of the Ohio Revised Code. See Ohio Rev. Code § 2744.03(A)(6); see also Woods, 254 F. Supp. at 881. Under Ohio law, malice "can be defined as the willful and intentional design to do injury, or the intention or desire to harm another, usually seriously, through conduct which is unlawful or unjustified. See Woods, 254 F. Supp. at 881 (citing Jackson v. Butler Cty. Bd. Of City Comm'rs., 76 Ohio App. 3d 448, 453-54, 602 N.E.2d 363, 367 (Ohio App. Ct. 1991)). Armstrong has alleged that Defendant Officers acted "without justification" to cause or attempt to cause Armstrong physical harm. Thus, under the facts alleged, Defendant Officers are not immune from liability on Armstrong's assault and battery claim, and Defendants Motion to Dismiss as to that claim is therefore **DENIED**.

### 3. Intentional Infliction of Emotional Distress

Armstrong brings her claim for intentional infliction of emotional distress against all Defendants. However, the City is immune from claims based on the intentional torts of their employees. See Ohio Rev. Code § 2744.02; see also, e.g., Wilson v. Stark Cty. Dept. of Human Servs., 70 Ohio St. 3d 450, 452, 639 N.E.2d 105, 107 (Ohio 1994); Daniel v. Cleveland Mun.

17

School Dist., No. 83541, 2004 WL 1945688, at (Ohio App. Ct. Sept. 2, 2004).[7]  Thus, Armstrong's claim against the City for intentional infliction of emotional distress is **DISMISSED**.

To state a claim for intentional infliction of emotional distress against Defendant Officers, Armstrong must allege: "(1) the defendant[s] either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional harm to the plaintiff; (2) the defendant[s'] conduct was extreme and outrageous; (3) the defendant[s'] actions proximately caused plaintiff's psychic injury; and (4) the mental distress suffered by the plaintiff was serious."  See Piro v. Franklin Twp., 102 Ohio App. 3d 130, 142, 656 N.E. 2d 1035, 1043 (Ohio App. Ct. 1995).  Armstrong has alleged each of these elements. (See doc. # 19, ¶¶ 95-98).

As with Armstrong's claim for assault and battery, however, Defendant Officers are immune from liability for her claim of intentional infliction of emotional distress under Ohio Rev. Code § 2744.03(A)(6) unless Armstrong has alleged an exception to immunity under Ohio Rev. Code § 2744.03(A)(6).  Armstrong alleged that Defendant Officers acted with malice.  (See doc. # 19, ¶ 99).  This allegation is sufficient to strip Defendant Officers of immunity under state law.  See Ohio Rev. Code § 2744.03(A)(6); see also Woods, 254 F. Supp. at 881.  Armstrong has therefore stated a claim against Defendant Officers for intentional infliction of emotional distress, and Defendants' Motion to Dismiss is **DENIED** as to that claim.

---

[7]The Court notes that in Kammeyer v. City of Sharonville, 311 F. Supp. 2d 653  (S.D. Ohio 2003) (section 2744.02 does not bar claim against city for intentional infliction of emotional distress), its sister court found that section 2744.02 violated the Ohio constitution.  This Court, however, declines to follow that decision and instead follows the Ohio court decisions which continue to apply section 2744.02.

IV.     CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss (doc. # 20) as to Armstrong's claims under 42 U.S.C. § 1983 against the City, Armstrong's claim under 42 U.S.C. § 1983 against Defendant Officers for unreasonable search and seizure, Armstrong's claim against Defendant Officers of excessive force under the Fourteenth Amendment, Armstrong's claims for false arrest and malicious prosecution, and Armstrong's claim against the City for intentional infliction of emotional distress.  The Court otherwise **DENIES** Defendants' Motion to Dismiss.

IT IS SO ORDERED.

        ___s/Susan J. Dlott_____
        Susan J. Dlott
        United States District Judge